UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Keith Kreszowski,                       Case No. 3:17-cv-2371

         Plaintiff,

     v.                                              MEMORANDUM OPINION
                                                                      AND ORDER

FCA US LLC, *et al.*,

         Defendants.

## I. INTRODUCTION

Defendant United Automobile, Aerospace and Agricultural Implement Workers of America, Local 12 (the "Union"), and Defendant FCA US LLC have filed separate motions for summary judgment on all claims asserted by Plaintiff Keith Kreszowski. (Doc. Nos. 50 and 54). Kreszowski filed briefs in opposition to both motions. (Doc. Nos. 59 and 58). Defendants filed briefs in reply. (Doc. Nos. 60 and 61). For the reasons stated below, I grant Defendants' motions.

## II. BACKGROUND

Kreszowski began working on FCA's production line in July 2013. He became a member of the Union at the same time. One of Kreszowski's coworkers on the afternoon shift was Ken Sukalo. In late September 2016, Kreszowski submitted a safety complaint against Sukalo, asserting Sukalo had committed a safety violation by manually disabling a stop pole on the assembly line. (Doc. No. 49 at 11-12). According to Kreszowski, Sukalo's action came without warning and

created a risk that Kreszowski could have been hit by a vehicle moving down the assembly line. (*Id.*).

A few days later, on September 30, 2016, Kreszowski shut down production on the line after witnessing Sukalo walk away from his workstation. (*Id.* at 13). The line was down for approximately 10-15 minutes, until workers in the skilled trades department were able to come to that portion of the plant and restart the line. (*Id.*). Kreszowski submitted another safety complaint to Dianna Kurth, the team leader in his part of the assembly line, and to Mike McGee, his union steward. (*Id.*).

On October 6, Kreszowski received a verbal warning from his supervisor, Nichole Banks, for failing to follow safety procedures when he shut down the line. Kreszowski was upset Banks disciplined him based upon what Kurth and Sukalo had told her, and without talking to him first. (*Id.* at 14-15). Kreszowski acknowledged raising his voice, speaking quickly, and using hand gestures, but denied yelling or screaming while talking to Banks. (*Id.* at 15). Kreszowski asserted he commonly speaks quickly and uses hand gestures during conversation. (*Id.*). He stated he was "being firm" in order to communicate his disagreement with Banks disciplining him without first getting his side of the story. (*Id.*).

Kreszowski left the meeting with Banks and went to talk to Rex Maze, the UAW Safety Coordinator. About 10 or 15 minutes later, Kurth came to Maze's office to talk to Kreszowski. After Kurth denied telling Banks anything about the September 30 incident, Kreszowski said he was thinking about calling the Occupational Safety and Health Administration ("OSHA") and stated that, if OSHA came to the plant, "with all the safety issues and hazards they got, they'd shut down the plant in reference to safety." (Doc. No. 49 at 17). Kreszowski repeated the same statement to Brian Sims, a UAW representative. (*Id.*).

While he was in Maze's office, Kreszowski requested and received permission to take the next day off of work, with the intention of going to the OSHA office to file a complaint. (*Id.* at 18).

After some further discussions with Maze, Sims, and others, Kreszowski left the plant and went home. After he left, he sent a text message to Kurth asking for Banks' last name, so he could include it in his whistle blower complaint. (*Id.* at 17). At some point during their conversations on the night of October 6-7, Kreszowski said something that Kurth interpreted as a threat. (*Id.* at 18-19). Kurth reported this development to Banks. (*Id.*).

Kreszowski took October 7 off, as scheduled, and filed a complaint with OSHA. (*Id.* at 20). He also sent a text message to Larry Maurer, the plant Operations Manager, indicating he thought his health and safety were being compromised at FCA, and that Sukalo was dangerous. (*Id.*).

On October 10, Kreszowski met with a joint FCA-Union group known as a Local Response Team ("LRT"). The LRT is a collectively-bargained committee made up of designated individuals from both entities, including FCA management and members of the Union leadership, security and medical officers, and a representative from the Union's Employee Assistance Program. The LRT is intended to prevent "troubling situations from worsening." (Doc. No. 50-12 at 2).

During the October 10 meeting, Kreszowski provided a two-page summary of the October 6 incident and his specific concerns about Sukalo's actions. (Doc. No. 49 at 21; Doc. No. 49-2 at 1-2). Kreszowski also indicated he was concerned about whether he would be safe working under Banks' supervision in the future, because she had disciplined him and not Sukalo. (Doc. No. 49 at 21).

The parties disagree about Kreszowski's conduct during the meeting. Mark Epley, a Union representative and a participant in the October 10 meeting, states "Kreszowski was very agitated during this meeting and was slamming his fist on the table. He seemed almost out of control." (Doc. No. 50-12 at 3). Connie Rubin, a human resources department employee and participant in the October 10 meeting, later reported that, when she reached out her hand to touch Kreszowski's arm, he "glared at her and said, 'You don't want to do that.'" (Doc. No. 54-3 at 9). Kreszowski

3

denied pounding his fists or hands on the table or being out of control. (Doc. No. 49 at 22). He described himself during the meeting as "[p]robably excited . . . [and a] little nervous." (*Id.*).

During the meeting, Epley requested that Kreszowski's October 6 disciplinary notice be removed from his record. (Doc. No. 50-12 at 3). FCA agreed to the request and the discipline was voided. (*Id.*; Doc. No. 49-6). At the conclusion of the meeting, the LRT told Kreszowski he could return to his workstation. (Doc. No. 49 at 24). Kreszowski, feeling "a little threatened" by what he viewed as "hostile and retaliatory circumstances," asked for the rest of the day off. (*Id.* at 23-24). After leaving work, Kreszowski still had reservations about returning to work. He then received permission to take the next two days – October 11 and 12 – off as well. (*Id.* at 24-25).

Kreszowski returned to FCA on October 13 for another meeting with the LRT. Kreszowski presented some additional written concerns during that meeting. (Doc. No. 49-3). He expressed concern for his safety and welfare, as well as concern that Banks and Sukalo would retaliate against him. (*Id.* at 1). He requested a transfer to another job assignment, stating "[t]he frustrations and repetitive actions that have occurred within the group has put myself in a[n] emotional state that is detrimental, and I am attempting to eliminate[] that state of mind due to the environmental conditions that exist." (*Id.*). He asserted the Union and FCA had failed to assist him with the safety concerns he previously had raised about his work environment and concluded by saying he would "continue to sort matters of concern[] and any repercussions that may occur in the future to the best of my ability and determine what resources are available to assist me with the unforeseen circumstances." (*Id.* at 2). Kreszowski believed Sukalo, Kurth, and Banks coordinated to discipline him for the September 30 incident and that there was a "strong likelihood" they would engage in similar behavior in the future. (Doc. No. 49 at 26).

During the meeting, one of the LRT members, Charlene Hutchinson, asked Kreszowski if he could guarantee he wouldn't harm someone when he returned to work. (*Id.* at 28). Kreszowski

4

denied he would harm anyone, but stated he may not take otherwise-appropriate actions (like shutting down the line again) because he was afraid of being disciplined again and that such a situation might result in harm to himself or a coworker. (*Id.*). Epley, concerned Kreszowski was implying "he did not know if he would be safe and cause no harm if he returned to work," interrupted Kreszowski and told him to choose his words carefully. (Doc. No. 50-12 at 3). Kreszowski thought this was a misinterpretation of what he was saying, though he admits he was under a fair amount of stress during the October 13 meeting due to his worries about his work environment. (Doc. No. 49 at 28). Epley recalled that Kreszowski "became very upset . . . [and] kept talking about feeling unsafe and unsure." (Doc. No. 50-12 at 3).

At the end of the meeting, Kreszowski requested additional time off work, with a return to work date of October 24, 2016. (Doc. No. 49 at 28). FCA approved his request as a personal leave of absence. (*Id.*). After the meeting, Epley called Kreszowski to tell him FCA had "a little bit of concern" about the way he answered Hutchinson's question. (*Id.* at 29). The next day, Tonya Tooson, an FCA human resources employee and an LRT member, called Kreszowski to tell him FCA was requiring him to undergo a fitness-for-duty exam before he could return to work due to the way he responded to Hutchinson's question. (*Id.*).

While Kreszowski disagreed with FCA's decision to continue his time off work as a personal leave of absence because his time off work was not voluntary, (*id.*), both Tooson and Epley described this characterization as the standard practice. (*Id.*; Doc. No. 50-12 at 4). Epley told Kreszowski he could go on medical leave if he saw the plant doctor and that a personal leave of absence was "actually more beneficial" because he received full pay rather than a reduced pay rate under the Sickness and Accident policy.[1] (*Id.*).

---

[1] Kreszowski disputes this, asserting a personal leave of absence is uncompensated. (Doc. No. 49 at 32).

5

On October 19, Kreszowski attended a psychological appointment Tooson scheduled with Dr. James Knowles, a Licensed Clinical Psychologist. Kreszowski described this meeting as short and indicated he did not learn until after the appointment that he could not return to work unless Dr. Knowles cleared him. (*Id.* at 29-30). Dr. Knowles did not clear Kreszowski after the initial appointment because he wanted to perform a more comprehensive evaluation, including administering the Minnesota Multiphasic Personality Inventory-2. (Doc. No. 53-3 at 1). FCA extended Kreszowski's leave of absence beyond October 24, which led Kreszowski to file a charge of discrimination against FCA on October 25, 2016. (Doc. No. 49-4). Kreszowski alleged FCA discriminated against him based upon a perceived disability by requiring him to complete the fitness-for-duty exam before returning to work. (*Id.* at 1). In February 2017, Kreszowski also filed a charge of discrimination against the UAW, alleging the Union had failed to advocate on his behalf because of a perceived disability. (Doc. No. 51-4).

Kreszowski ultimately had a total of four sessions with Dr. Knowles. On November 28, 2016, after the fourth session, Dr. Knowles approved Kreszowski to return to work but recommended he attend anger management classes and substance abuse counseling; and that he participate in cognitive-behavioral therapy to assist with stress management and anxiety reduction and support. (Doc. No. 53-3 at 1-3).

Jo'Lena Brown, an FCA labor relations specialist, approved Kreszowski's request to return to work on November 30, 2016, and informed him he would be made "whole for all lost time from October 10th to date." (Doc. No. 53-2 at 1). Further, Brown reiterated that Kreszowski was required to attend anger management classes after coordinating with a Union EAP representative. (*Id.*). Kreszowski contends he was not made whole, because he "did not receive time and a half he should have received, nor did he receive compensation towards his 401(k) for approximately a seven week period of time." (Doc. No. 58 at 10); (*see also* Doc. No. 49 at 36).

6

Kreszowski had another meeting with the LRT upon his return to work. He again expressed concerns that Sukalo and Banks would create a hostile environment for him because FCA and the Union did not investigate the incident leading Banks to issue Kreszowski a verbal disciplinary warning on October 6. (Doc. No. 49 at 36-37). Kreszowski returned to his previous work assignment where, he asserts, he was subjected to a hostile environment by Sukalo and others. (*Id.* at 37).

During his shift, Kreszowski had another employee call the skilled trades department to come down and fix a piece of equipment. (*Id.*) The skilled trades employee came down, along with Banks and several people from FCA management and the Union. (*Id.* at 38). Kreszowski contends Sukalo told people that Kreszowski had intentionally sabotaged the equipment and sought to harass him by making the incident into a larger situation. (*Id.* at 39-40). He also contends Sukalo and another employer, Cheri Hauser, were working together to intimidate and harass him for complaining to the HR department about the actions and conduct of some of his coworkers. (*Id.* at 40-41).

In the ensuing months, Kreszowski raised complaints regarding a variety of workplace incidents and interactions. (*Id.* at 42-47). Frustrated with what he viewed as lack of concern for these incidents, Kreszowski began contacting individuals in higher level management positions in FCA and the Union, including the then-CEO of FCA Group (Sergio Marchionne) and the Chief Human Resources Officer for FCA North America (Linda Knoll). On February 8, 2017, Kreszowski emailed Knoll, Brown, Epley, and another FCA employee named Christopher Capoldo to raise concerns that Banks was harassing him and retaliating against him because she "always questions" whether repairs or service Kreszowski requested were "necessary." (Doc. No. 49-8 at 4). Kreszowski believed this was a continuation of the issues about which he had raised complaints in the fall of 2016. (*Id.*).

7

In response, Vicki Patterson, an attorney and investigator in FCA's corporate office of Equal Employment Opportunity Compliance and Governance, initiated an investigation and contacted Kreszowski to discuss his concerns. (Doc. No. 54-3). While Kreszowski initially expressed interest in talking with Patterson, (Doc. No. 49-8 at 3-4), he subsequently told Patterson he felt she would "not respond in a balanced non biased manner," even if she concluded Banks, Sukalo, and the LRT members had acted hostilely toward him. (*Id.* at 1-2).

Kreszowski also took issue with the scope of Patterson's investigation. Patterson told Kreszowski she would investigate whether Bank had harassed, discriminated against him, or retaliated against him in violation of FCA's policies. (*Id.* at 11). She indicated, however, it was not her role to consider his OCRC charge, Brown's response to Kreszowski's claims he was owed money from his leave of absence, or whether the Union fairly represented him. (*Id.*). Kreszowski believed all of the incidents and occurrences about which he had complained were connected and related to the LRT's decision to require him to undergo a fitness-for-duty exam, and if Patterson was not willing to "revisit those issues and others[,] then certainly you, your office, and FCA [have] no concern or focus on eliminating corporate cultures and attitudes that foster and condone discrimination, intolerance, harassment, and the barrier that prevent equal opportunities." (*Id.* at 10-11).

While continuing to correspond with Kreszowski by email, Patterson also arranged for interviews with Kreszowski and others. In late March and early April 2017, Patterson interviewed Kreszowski, Sukalo, Tooson, Rubin, and Epley, among others. (Doc. No. 54-3 at 2-3, 5-12). Kreszowski continued to email Patterson with details of the alleged discrimination and harassment, and to take issue with the limited scope of her investigation. (Doc. No. 49-8 at 39-45). In particular, Kreszowski continued to accuse Patterson of having predetermined the outcome of her investigation in order to protect management officials at FCA and the Union. (*See, e.g., id.* at 39).

At some time in April 2017, Kreszowski and other employees were laid off as part of a shutdown for a plant-wide retooling. (Doc. No. 49 at 49-50). During the lay-off, Kreszowski learned that in October 2016, Keith Carr, a human resources representative, had filled out and signed a leave of absence form on Kreszowski's behalf. (Doc. No. 49-9). Kreszowski considered the document to be fraudulently submitted, because he did not know about it or authorize it before it was submitted. (Doc. No. 49 at 51). Roy Richie, FCA's Director of Labor Relations, indicated it is "not uncommon for an HR person to . . . fill out the form and subsequently approve it." (Doc. No. 52 at 4).

Over the next few months, the investigations into Kreszowski's allegations came to a close. On June 29, 2017, the OCRC issued a no-probable-cause decision with regard to Kreszowski's charge against FCA. The OCRC concluded there was no credible evidence to support Kreszowski's claim that he had been unlawfully discriminated against because FCA had "reason to believe [Kreszowski] needed to be placed on leave for safety reasons," he received paid time off, and his discipline was voided. (Doc. No. 49-5 at 1). Then, by a letter dated August 14, 2017, Patterson notified Kreszowski she had completed her investigation and determined there had not been a violation of FCA's discrimination and harassment prevention policy. (Doc. No. 49-10). Finally, on September 28, 2017, the OCRC dismissed Kreszowski's charge against the Union, concluding the Union had represented him and there was no evidence to support an inference of discrimination. (Doc. No. 51-6 at 1).

Kreszowski continued to raise his concerns about how he had been treated by sending emails to a variety of FCA and Union officials. By Kreszowski's estimate, he sent "a couple dozen"

9

emails to Marchionne and Knoll alone. (Doc. No. 49 at 52-53). At one point, Brown requested that Kreszowski stop sending emails to Knoll, though Kreszowski continued to do so.[2] (*Id.* at 53).

The lay-off was scheduled to end in October 2017. Prior to the end of the lay-off, Richie met with Kreszowski, Bruce Baumhower, (the UAW Local 12 President), and Harvey Hawkins (a UAW International representative) to discuss Kreszowski's concerns, as well as some concerns plant personnel had raised regarding Kreszowski. (Doc. No. 52 at 5). Though Richie was concerned by some of Kreszowski's "references to some of the folks at the plant," he assured Kreszowski that he would look into the leave-pay issue from October 2016, as well as Kreszowski's safety concerns. (*Id.*).

Kreszowski, however, sought more drastic assurances, indicating to Richie that he could not come back to work and be productive unless Richie terminated "a number of HR professional and unions reps in the plant." (*Id.*). Kreszowski believed Rubin, Tooson, and Epley had engaged in deceptive actions with "evil intentions" and should be terminated because of that and in connection with the leave of absence form Carr signed and approved. (Doc. No. 49 at 55).

Following the meeting, Richie told Kreszowski he would need to complete another fitness-for-duty exam before returning to work. Richie states he expressed to Kreszowski that

> based upon the meeting that we had with Mr. Hawkins and Mr. Baumhower present, references that he made to professionals in the plant, union reps being evil and having evil intentions along with the fact when I asked Mr. Kreszowski what would it take for him to return to work and be a productive member of the plant, his response was that certain individuals in the HR department and the UAW would have to be terminated in order for that to happen.

(Doc. No. 52 at 7).

---

[2] By November 2017, FCA had taken action to intercept Kreszowski's emails. Any email Kreszowski sent to an FCA email address was rerouted to Rubin. (Doc. No. 49 at 60). Kreszowski began changing his email address in order "to get around everything going to Connie Rubin." (*Id.* at 60-61).

10

Richie then placed Kreszowski on a company-paid leave for a few weeks before he transitioned to a medical leave. (*Id.* at 8-9). According to Richie, Kreszowski "did not receive that information well." (*Id.* at 7). Kreszowski again raised concerns about how he would be paid. He argued he should receive overtime pay for the days when his group worked more than 8 hours. (Doc. No. 49 at 55). Richie rejected this position because the Collective Bargaining Agreement entitled hourly employees to 40 hours per week, with any overtime hours being "at the discretion of management." (Doc. No. 52 at 7).

On October 30, 2017, Kreszowski met with Dr. Craig Lemmen, a psychiatrist, for an interview for his second fitness-for-duty exam. Dr. Lemmen concluded that, while Kreszowski was not at an increased risk of causing significant harm to himself or others and could adequately perform specific job tasks, he did have "a psychiatric problem which interferes with his ability to positively interact with co-workers and supervisors." (Doc. No. 54-2 at 3-4). Dr. Lemmen recommended FCA provide Kreszowski with time off from work so that he could participate in psychotherapy to assist him in reducing problematic interactions with his co-workers and supervisors. (*Id.* at 4-5).

Pursuant to Dr. Lemmen's recommendations, FCA instructed Kreszowski to schedule an appointment with a psychiatrist, and to see a psychologist while waiting for his psychiatry appointment. (Doc. No. 49-15). The record is unclear as to whether Kreszowski saw a psychologist before he subsequently began seeing a psychiatrist, Dr. Kettlie Daniels, in January 2018. According to Kreszowski, his relationship with Dr. Daniels got off to a rocky start. He believed he was required by FCA to see Dr. Daniels for a treatment plan provided by Dr. Lemmen, while Dr. Daniels thought she was supposed to perform an evaluation and assessment. (Doc. No. 49 at 58). Kreszowski eventually signed a consent form allowing Dr. Daniels to talk with Richie to get additional information, but then came to believe that Dr. Daniels would not be able to implement a

11

useful treatment plan because she "accepted Roy Richie's version of events as the facts" and based his treatment plan on "falsehoods that [were] injected into the circumstances." (*Id.* at 59).

Dr. Daniels diagnosed Kreszowski with an adjustment disorder, indicated he was not cleared to return to work, and provided a certification for his medical leave. (*Id.*). She also proposed a treatment plan and recommended Kreszowski take certain medications as part of his treatment. (*Id.*). Kreszowski ultimately refused to take the medications or to participate in Dr. Daniels' recommended treatment plan, believing she was not objective and tended to believe FCA's explanations over his own. (*Id.* at 59-60). Dr. Daniels eventually terminated the doctor/patient relationship in April 2018. (*Id.*; Doc. No. 49-16 at 25).

Kreszowski filed a second charge against FCA with the OCRC in November 2017, alleging FCA was retaliating against him for filing his previous OCRC charge by prohibiting him from returning to work following the lay-off, requiring him to undergo a second fitness-for-duty exam, and placing him on paid leave. (Doc. No. 49-13). Kreszowski initiated this litigation shortly before he filed the second charge against FCA. He formally withdrew that charge on January 30, 2018, in order to pursue the allegations under the charge in litigation. (Doc. No. 49-14). After obtaining leave, he subsequently filed his First Supplemental Complaint to add facts and claims related to the second OCRC charge. (Doc. No. 23).

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law.  *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## IV. ANALYSIS

Kreszowski asserts claims under the Americans with Disabilities Act and Ohio Revised Code § 4112.02, alleging both Defendants discriminated against him on the basis of a perceived disability and that FCA retaliated against him after he filed his first OCRC charge.[3]  Both Defendants argue there is no genuine dispute of material fact as to any of Kreszowski's claims and, therefore, they are entitled to judgment as a matter of law.

### A. DISABILITY DISCRIMINATION

Kreszowski contends the Defendants violated the ADA when they required him to take personal leaves of absence from work, refused to permit him to return to work, and failed to file grievances or otherwise advocate for him, because they perceived him as disabled.  An employee may be "regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties."  *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001).

Kreszowski first must put forward a prima facie case of disability discrimination by showing: Defendants (a) "treated him as having an impairment that substantially limits one or more of his major life activities"; (b) he was otherwise qualified for his position; and (c) FCA took adverse

---

[3]  As the parties note, federal caselaw interpreting federal employment discrimination statutes applies to employment discrimination claims under Ohio law.  *See, e.g., Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1115 (6th Cir. 2001); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004); *Muir v. Chrysler LLC*, 563 F. Supp. 2d 783, 788 (N.D. Ohio 2008) (citing *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204 (Ohio 1998)).

employment actions, and the Union failed to adequately represent him, because each of them regarded him as disabled. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999).

If Kreszowski establishes a prima facie case, the burden of production shifts to the Defendants to provide a legitimate, nondiscriminatory reason for their actions. *Id.* at 813. If they do so, Kreszowski must show "the reason was pretextual and that discrimination against his [perceived] disability was the real motivation" for Defendants' actions. *Id.* Kreszowski could do so by showing "the reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 858 (6th Cir. 2018) (citations and internal quotation marks omitted). Ultimately, Kreszowski "must produce 'sufficient evidence from which a jury could reasonably reject'" Defendants' explanation for their conduct. *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

**1. FCA**

To satisfy his initial burden, Kreszowski argues that though he was qualified for his position, FCA regarded him as disabled and took adverse actions against him in the fall of 2016 when they kept him off work, required him to undergo a fitness-for-duty exam without justification, and failed to give him overtime pay or make contributions to his 401(k) during his forced leave of absence. (Doc. No. 58 at 18-20).

FCA contends Kreszowski cannot show FCA regarded him as disabled because Kreszowski's comments and behaviors raised justifiable concerns about his ability to perform his job duties. FCA also argues Kreszowski was not qualified for his position because Dr. Knowles did not clear him to return to work until November 29, 2016. Finally, FCA asserts Kreszowski cannot establish an adverse employment action because FCA was permitted to require him to undergo the fitness-for-duty examination.

Kreszowski can establish the last two portions of his prima facie case. The second element considers whether Kreszowski was <u>otherwise</u> qualified – that is, whether he could be capable of performing his job duties outside of the issue in dispute between the parties. FCA has not identified evidence to suggest there was a reason (other than his comments and behaviors and the resulting exam requirement) which disqualified Kreszowski from performing his job functions.

Kreszowski also identifies an adverse employment action. FCA has not presented evidence to dispute Kreszowski's claim that he was compensated differently while on leave. *See* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . employee compensation . . . and other terms, conditions, and privileges of employment.").

Kreszowski's discrimination claims fall short, however, because he has not established FCA treated him as having an impairment that substantially limited one or more major life activities. An employer's need "to be able to determine the cause of an employee's aberrant behavior . . . is not enough to suggest that the employee is regarded as mentally disabled." *Sullivan*, 197 F.3d at 810; *see also Mitchell v. United States Postal Serv.*, 738 F. App'x 838, 845 (6th Cir. 2018) ("[A]n employer's concern about workplace safety is a legitimate, nondiscriminatory reason for requesting a medical examination consistent with a business necessity.").

An employer may require an employee to undergo an examination by a medical professional if the examination is "'job-related and consistent with business necessity,'" and there is "significant evidence that could cause a reasonable person to inquire as to whether [the] employee is still capable of performing his job." *Sullivan*, 197 F.3d at 811 (quoting 42 U.S.C. § 12112(d)(4)(A)). The Sixth Circuit has identified three types of circumstances which show the employer's request is necessary and job-related: "(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or

15

others." *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007).

Kreszowski acknowledges he: (a) indicated he thought his health and safety were being compromised at FCA, and that Sukalo was dangerous; (b) was concerned about whether he would be safe working under Banks' supervision in the future, because she had disciplined him and not Sukalo; (c) asked for permission to take off the remainder of his October 10 shift, and later October 11 and 12, because he felt "a little threatened" by what he viewed as "hostile and retaliatory circumstances"; (d) believed Sukalo, Kurth, and Banks coordinated to discipline him for the October 6 incident and that there was a "strong likelihood" they would engage in similar behavior in the future; (e) stated he may not take otherwise-appropriate actions (like shutting down the line again) because he was afraid of being disciplined again and that the situation might result in harm to himself or a coworker. (Doc. No. 49 at 20, 21, 23-26, and 28). These admissions constitute "'significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job.'" *Denman*, 266 F. App'x at 380 (quoting *Sullivan*, 197 F.3d at 811)).

There is "no need to address the question of pretext" where the plaintiff has not established a prima facie case. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1048 (6th Cir. 1998). Even if I assume Kreszowski could establish a prima facie case, he is unable to demonstrate that FCA's proffered reason is a pretext for discrimination.

FCA asserts it placed Kreszowski on leave because of Dr. Knowles requested time to perform a more comprehensive evaluation before making a recommendation as to whether he would clear Kreszowski to return to work.[4] (*See* Doc. No. 53-3 at 1). Kreszowski contends Dr. Knowles' request did not actually motivate FCA's decision because the fitness-for-duty examination

---

[4] Kreszowski himself had requested leave from October 10 through October 24, 2016, the period of time within which he first met with Dr. Knowles. (Doc. No. 49 at 28).

16

was not consistent with business necessity and because FCA suggested Kreszowski utilize EAP services rather than address his safety concerns. (Doc. No. 58 at 20-21).

I already have rejected Kreszowski's first argument. The record evidence plainly establishes FCA was legally permitted to require Kreszowski to undergo a fitness-for-duty examination before returning to work. His second argument fares no better. When viewed against the significant evidence supporting FCA's exam directive and subsequent imposition of leave, the fact that it was suggested that Kreszowski contact an EAP representative falls far short of demonstrating that "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

I conclude FCA is entitled to summary judgment on Kreszowski's discrimination claims.

### 2. The Union

Kreszowski asserts the Union perceived him as disabled when it did not object to FCA's decision to require a fitness-for-duty exam and by failing to file a grievance regarding FCA's failure to pay him overtime pay or make 401(k) contributions during his leave of absence. (Doc. No. 59 at 17-19).

The Union argues it did not perceive Kreszowski as disabled and did not challenge FCA's examination requirement because "Kreszowski's own words referencing his detrimental emotional state, his requests for more time off, and his concerns about not being able to work safely created an issue about whether Kreszowski could perform the essential functions of the job, which could only be resolved through a fitness for duty exam." (Doc. No. 60 at 2).

As I concluded above, FCA was legally permitted to require Kreszowski to undergo the fitness-for-duty exam. Kreszowski contends Epley's comment that Kreszowski needed to "get better and follow the doctor's instructions" is proof that the Union did not object to this

requirement because it regarded him as disabled. (Doc. No. 59 at 18). This argument is not persuasive, as the "perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled." *Sullivan*, 197 F.3d at 810.

Kreszowski does not identify any other evidence which might create a genuine dispute of material fact as to whether the Union regarded him as disabled. Therefore, he cannot establish a prima facie case. I conclude the Union is entitled to summary judgment on Kreszowski's discrimination claims.

### B.     RETALIATION

Kreszowski also claims FCA retaliated against him for filing his October 2016 Charge of Discrimination with the OCRC. Kreszowski, for this claim, "must show: '(1) that he engaged in protected activity; (2) that he suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action.'" *Sullivan*, 197 F.3d at 814 (quoting *Penny v. United Parcel Serv.,* 128 F.3d 408, 417 (6th Cir. 1997)).

Kreszowski claims Richie retaliated against him by requiring him to undergo a second fitness-for-duty examination before he would be permitted to return from the facility-wide lay-off and that he also suffered an adverse employment action when he was placed on medical leave at a reduced percentage of his normal earnings. (Doc. No. 58 at 21-22). The parties disagree regarding whether Richie knew about Kreszowski's OCRC charge and whether the second fitness-for-duty exam and the Sickness and Accident pay constitute adverse employment actions. I need not resolve those disputes, however, because Kreszowski cannot establish a causal connection between his protected activity and the purported adverse actions.

Kreszowski first suggests there is a causal connection between the filing of his first OCRC charge against FCA in October 2016 and Richie's imposition of the fitness-for-duty exam requirement in October 2017 based upon "the timing of the two events." (*Id.* at 23 (citation and

quotation marks omitted)). Kreszowski implicitly concedes this argument is on shaky ground, (*id.*), as courts "have rarely found a retaliatory motive based only on temporal proximity." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (noting the consistent requirement that plaintiff offer additional evidence). In *Vereecke*, the Sixth Circuit referred to the passage of a shorter period of time (eight months) as proof of "little more than coincidence." *Id.*

Kreszowski then seeks to tie the two events together by noting he was kept off work after discussing his charge with Richie and through reference to the fact he was "continually complaining about the discrimination and retaliation he suffered." (Doc. No. 58 at 23). As to his first point, Kreszowski does not identify any case law which would permit him to reset the clock in this manner, particularly in light of the fact he also argues FCA already had knowledge of his OCRC charge because Brown knew he had filed it and she participated in the meeting with Riche. (*Id.* at 21).

Moreover, Kreszowski's intervening complaints do not create an inference of retaliation. While the record is clear that Kreszowski raised frequent concerns about retaliation, the alleged retaliation – by his own characterization – arose from Kreszowski's complaints about unsafe work practices and what he viewed as FCA's subsequent failure to take his complaints seriously. (*See, e.g.,* Doc. No. 49 at 36-37, 42-47). "The ADA is not . . . a catchall statute creating a cause of action for any workplace retaliation, but protects individuals only from retaliation for engaging in, or aiding another who engages in, activity covered by the ADA." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing 42 U.S.C. § 12203(a)); *see also id.* ("'Protected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination.'" (quoting *Goonan v. Fed. Reserve Bank of New York*, 916 F. Supp. 2d 470, 484-85 (S.D.N.Y. 2013) (further citation omitted))). While the ADA prohibits an employer from taking adverse actions in response to an employee's charge of discrimination, it does not apply to Kreszowski's safety-related complaints or FCA's acts or

omissions in response to his complaints about safety. Therefore, he cannot use those unprotected actions to create a causal connection between his first OCRC charge and the second fitness-for-duty exam.

Kreszowski does not point to any evidence that he complained to FCA about alleged discrimination regarding a perceived disability or about retaliation for his OCRC charge in the nearly 12 full months between the date he filed his first OCRC charge and his meeting with Richie. Even when viewed in the light most favorable to Kreszowski, the record evidence does not support an inference of a causal connection between his 2016 OCRC charge and FCA's decision to require him to undergo a second fitness-for-duty examination or his subsequent placement on medical leave. Kreszowski fails to show a jury reasonably could find in his favor on his retaliation claims and, therefore, FCA is entitled to summary judgment.

### V.    CONCLUSION

I conclude a reasonable jury could not find in Kreszowski's favor on either his discrimination or his retaliation claims. Therefore, and for the reasons stated above, I grant the motions of the Union, (Doc. No. 50), and FCA, (Doc. No. 54), for summary judgment.

So Ordered.

s/ Jeffrey J. Helmick<br>United States District Judge